592 A.2d 797

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA), Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

CITY OF PHILADELPHIA, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 6, 1991.

Decided June 3, 1991.

272

Alexander Kerr and Rick L. Frimmer, for petitioner, SEPTA.

Gerald T. Clark, for petitioner, City of Philadelphia.

David A. Salaga, for respondent.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

PELLEGRINI, Judge.

This is a consolidated appeal from an order of the Pennsylvania Public Utility Commission (PUC), finding that the Southeastern Pennsylvania Transportation Authority (SEPTA) and the City of Philadelphia (City) have certain maintenance responsibilities for the Woodland Avenue Bridge (Bridge), which is part of a separated rail-highway crossing. The Bridge carries Woodland Avenue, a City street, and SEPTA's facilities over and above two sets of SEPTA's electrified railroad tracks which are part of its Media/West Chester commuter rail line.

In 1987, the PUC, prompted by other bridge maintenance investigations [1] which revealed that no one was maintaining the Bridge, commenced an investigation to determine ownership of the Bridge and to appoint maintenance responsibilities. To address the Bridge's immediate maintenance needs, the PUC issued an interim order directing SEPTA to assume maintenance responsibilities for the substructure and superstructure and the City to assume maintenance responsibilities for the entire bituminous wearing surface of the Bridge.

After hearings to determine final maintenance responsibilities, an Administrative Law Judge (ALJ) determined that SEPTA was the owner of the Bridge. Finalizing the terms set forth in the interim order, the ALJ, in his Recommended Decision, assigned permanent maintenance responsibilities for the Bridge's substructure and superstructure, as well as for the trolley facilities on the Bridge, to SEPTA. He also recommended that the City should be assigned permanent maintenance responsibilities for the entire bituminous wearing surface and curbs, sidewalks and protective railings on the Bridge and its approaches, as well as ice, snow and debris removal. Both SEPTA and the City filed timely exceptions to the ALJ's Recommended Decision.

Rejecting both SEPTA's and the City's claim that the assignment of maintenance responsibilities was incorrect, the PUC adopted the ALJ's Recommended Decision with minor technical modifications. Both SEPTA and the City filed Petitions for Review with this Court, seeking review of the PUC's order. The Commonwealth of Pennsylvania,

1. The PUC investigations were conducted to evaluate the safety, structural adequacy, load-carrying capacity, and economic impact of all bridges above the grade of railroad tracks of all railroads operating in the Commonwealth. The first investigation, in March 1982, focused on posted public off-state highway system bridges. The second, in May 1985, focused on bridges carrying public highways other than state highways. In August 1985, the Commonwealth of Pennsylvania, Department of Transportation (PennDot) initiated its own bridge inspection program pursuant to a Federal Highway Administration mandate that all bridges 20 feet or longer carrying a public highway meet the National Bridge Inspection Standards.

Department of Transportation (PennDot) intervened in both Petitions, and the Consolidated Rail Corporation (Conrail) and the City intervened in SEPTA's. The two Petitions were consolidated by order of this Court.

■ Our scope of review in PUC cases is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the PUC's findings and conclusions are or are not supported by substantial evidence. *Vacation Charters, Ltd. v. Pennsylvania Public Utility Commission*, 133 Pa.Commonwealth Ct. 179, 575 A.2d 640 (1990).

■ The PUC is granted the power to regulate railroad-highway crossings[2] pursuant to Sections 2702 and 2704 of the Public Utility Code (Code), 66 Pa.C.S. §§ 2702, 2704.[3] The rationale underlying the Commonwealth's entrustment of broad powers to the PUC to exercise the Commonwealth's police power with respect to railroad-highway crossings is to prevent railroad-highway crossings from becoming unsafe for the public. *See, e.g., Pittsburgh Railways Co. v. Pennsylvania Public Utility Commission*, 198 Pa.Superior Ct. 415, 424, 182 A.2d 80, 84 (1962); *Tarentum Borough v. Pennsylvania Public Utility Commis-*

---

2. A "crossing" is an intersection of two or more public utilities. *See, e.g., City of Philadelphia v. Pennsylvania Public Utility Commission*, 449 Pa. 402, 296 A.2d 804 (1972). A railroad-highway crossing is the intersection of a highway with a railroad's right-of-way upon which railroad tracks lie and can be at, above or below the grade of the railroad tracks. Because railroad-highway crossings are constructed not only for the convenience of the traveling public but also for the safety of the public, *see, e.g., Borough of Bridgewater v. Pennsylvania Public Utility Commission*, 181 Pa.Superior Ct. 84, 123 A.2d 266 (1956), the applicable standard in railroad-highway crossing cases is "the prevention of accidents and the promotion of safety of the public." *Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission*, 154 Pa.Superior Ct. 86, 91, 35 A.2d 588, 590 (1944).

3. The PUC's jurisdiction over railroad-highway crossings is not unlimited, but when it attaches, it is exclusive. *Consolidated Rail Corp. v. Pennsylvania Public Utility Commission*, 55 Pa.Commonwealth Ct. 576, 423 A.2d 1108 (1980).

*sion,* 171 Pa.Superior Ct. 156, 160–61, 90 A.2d 853, 855 (1952).

Section 2702 of the Code provides in pertinent part:

**(b) Acquisition of property and regulation of crossing.**—The [PUC] is hereby vested with exclusive power to appropriate property for any [rail-highway] crossing, ... and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

Furthermore, the General Assembly has vested in the PUC the power to allocate the cost of maintaining a railroad-highway crossing in a proper and safe condition among all parties concerned with the crossing. 66 Pa.C.S. § 2704. Section 2704 provides in pertinent part:

**(a) General rule.**—[T]he cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided in this section, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the [PUC] may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties.

I.

SEPTA'S APPEAL

Proportioning the maintenance responsibilities as to each of the parties as authorized by the Code, the PUC assigned permanent maintenance responsibilities to SEPTA for the substructure and superstructure of the Bridge because:

* the Bridge is owned by SEPTA;

\*' it was originally built by SEPTA's predecessor in title for the construction of the rail line beneath the Bridge which now carries SEPTA's commuter rail lines;

\*' SEPTA trolley facilities occupy the Bridge.

SEPTA challenges the PUC's assignment of maintenance responsibilities because it believes that the PUC incorrectly applied the Code to impose those maintenance responsibilities, and even if it correctly applied the Code, SEPTA claims it is exempt from being assigned those maintenance responsibilities under both federal and state law.

### A.

Insofar as the assignment by the PUC to SEPTA of certain continuing maintenance responsibilities for the Bridge, both because SEPTA owns the Bridge and the Bridge carries the highway over its commuter rail line,[4] SEPTA contends that the PUC is foreclosed from assigning it those responsibilities under 45 U.S.C. § 581(c)(5). That provision exempts certain commuter rail authorities, such as SEPTA, from "taxes and other fees" relating to the operation of commuter rail lines to the same extent as National Rail Passenger Corporation (Amtrak) is exempt. To determine whether SEPTA is exempt from being assigned bridge maintenance responsibilities, we must examine both the congressional purpose and intent behind the enactment of 45 U.S.C. § 581(c)(5), as well as federal decisions interpreting that provision to see if it is intended that the imposition of those responsibilities are precluded as a tax or a fee on commuter rail authorities.

Congress, concerned that local commuter authorities would be unable to operate commuter lines that were to be transferred from Conrail to the local commuter authorities

4. Even though SEPTA argues that it is exempt under federal law because it is a "commuter authority," SEPTA would still be liable for maintenance responsibilities because of its trolley tracks on the Bridge.

as part of Conrail's reorganization,[5] enacted the Northeast Rail Service Act of 1981, Pub.L. 97–35, 95 Stat. 647 (1981), which established the Amtrak Commuter Service Corporation (Amtrak Commuter). Amtrak Commuter, a wholly-owned subsidiary of Amtrak, was intended to facilitate the transfer of commuter rail service from Conrail to local commuter authorities by entering into contracts with local commuter authorities for the operation of commuter rail service in their respective regions. 45 U.S.C. § 581(b)(2).

Congress, which had previously exempted Amtrak from taxes and other fees,[6] extended that exemption to Amtrak Commuter. 45 U.S.C. § 581(c)(3).[7] In 1988, Congress extended the federal tax exemption to those "commuter authorities" which acquired commuter service property from Conrail and operated commuter services. 45 U.S.C. § 581(c)(5). Section 581(c)(5) provides:

> Notwithstanding any other provision of law, any commuter authority that could have contracted with Amtrak Commuter for the provision of commuter service but which elected to operate directly its own commuter service as of January 1, 1983, shall be exempt from the payment of taxes or other fees to the same extent as the Corporation is exempt. Such exemption shall be effective as of October 1, 1981.

SEPTA contends that because it is specifically included in the definition of "commuter authority," the federal tax

5. Conrail was to be relieved of all legal obligations to operate its commuter service as of January 1, 1983. 45 U.S.C. § 744a.

6. Section 45 U.S.C. § 546(b) provides:
Notwithstanding any other provision the National Railroad Passenger Corporation (the "Corporation") shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State or local taxing authority, which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981, including such taxes and fees levied after September 30, 1982: Provided, however, that notwithstanding any provision of law, the Corporation shall not be exempt from any taxes or other fees which it is authorized to pay as of September 10, 1982.

7. Section 581(c)(3) provides: "Amtrak Commuter shall be exempt from the payment of taxes to the same extent as the Corporation is exempt under section 546(b) of this title."

exemption should apply to SEPTA with regard to maintenance allocations for the Bridge. In support of its contention, SEPTA relies on *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania, Public Utility Commission,* 665 F.Supp. 402 (E.D.Pa.1987), *aff'd.,* 848 F.2d 436 (3d Cir.1988), *cert. denied,* 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988) (*Amtrak I*) and *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania, Public Utility Commission,* 1991 WL 998 (No. 86–5357, filed January 3, 1991) (*Amtrak II*).

In *Amtrak I,* Amtrak challenged in federal district court a PUC order which required Amtrak to reconstruct and maintain the Cassatt Avenue Bridge, an overhead highway bridge located in the Township of Tredyffrin. Affirming the district court, the Third Circuit found that the maintenance responsibilities imposed on Amtrak were "special assessments" which amounted to a "tax or other fee" under 45 U.S.C. § 546(b). Central to the Third Circuit's decision that the PUC's imposition of maintenance responsibilities on Amtrak should be considered taxes was that:

* "taxation serves to erode the revenue-to-cost ratios which impact on whether states and localities continue to receive the benefit of Amtrak services." S.Rep. No. 253, 97 Cong., 1st Sess. 108 (1981).
* "there are many parts of the country which would be glad to pay an amount equal to local or state taxes owed by Amtrak in order to have the benefit of Amtrak services." S.Rep. No. 516, 97 Cong., 2d Sess. 180 (1982).
* Amtrak is performing a vital federal governmental service with a unique mission and purpose of providing federal passenger rail service, and the payment of taxes would impinge on the ability to carry out that service.

*Amtrak I,* 848 F.2d at 437–440. Applying the district court's statement that "it would be inappropriate to undermine those goals through [a] ... too stingy construction of the exemption," 848 F.2d at 437, the Third Circuit found

that the assignment of maintenance costs is akin to a special assessment and a tax. *Amtrak II*, where the PUC issued an order requiring Amtrak to maintain the *existing* bridge rather than to build a new one, the district court, finding it to be a distinction without a difference, re-affirmed that the PUC could not impose such a responsibility because it is prohibited as a tax.

The Second Circuit, however, was more "stingy" in applying the exemption than the Third Circuit in *Amtrak I*. In *National Railroad Passenger Corporation v. City of New York*, 882 F.2d 710 (2d Cir.1989), the Second Circuit found that Amtrak was still required to pay "rent" to the City of New York for use of "lands, streets, avenues, waters, rivers, highways and public places" in the City. Finding that such a payment was not a tax, the Second Circuit found that Congress intended only to exempt Amtrak from paying "taxes" as well as "fees" that had the effect of "taxes" of the ordinarily understood type listed in the legislative history.[8] It also found that it was not Congress' desire to exempt Amtrak from the payment of fees for municipal services used. 882 F.2d at 714. In finding that Amtrak's payment to New York for use of its rights-of-way were not "taxes" or "fees," the Second Circuit relied on the definition of those terms given by the Supreme Court in *National Cable Television Association v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). In that case, the Supreme Court defined "taxes" and "fees" as follows:

> [T]axation is a legislative function, and [a legislature] ... may act arbitrarily and disregard benefits bestowed by [a g]overnment on a taxpayer and go solely on ability to pay ... A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to prac-

---

8. H.R.Rep. No. 181, 97 Cong., 1st Sess. 19 (1981) stated that:
 The Committee bill exempts Amtrak from the payment of all state and local taxes, including but not limited to, property taxes, income and franchise taxes, gross revenue taxes, fuel taxes, license and other fees, to the same extent as the United States is exempt from the payment of such taxes and other fees.

282

tice law or medicine or construct a house or run a broadcast station.

415 U.S. at 340, 94 S.Ct. at 1149.

■ SEPTA urges us to extend the rationale in *Amtrak I*, interpreting that 45 U.S.C. § 546(b) precludes bridge maintenance responsibilities being imposed on Amtrak to also preclude PUC imposition of those responsibilities on it as a "commuter authority" under the exemption from "taxes and fees" contained in 45 U.S.C. § 581(c)(5).[9] While indistinguishable from this case as to responsibilities imposed, *Amtrak I* was largely based on the Third Circuit's narrow focus on Amtrak's "unique mission and purpose" in providing federal nationwide rail passenger service and then on the application of the traditional "liberal construction of governmental exemption" to all agencies of the federal government, i.e., an agency carrying out a federal purpose is not liable for the payments to state and local governments. 848 F.2d at 440. Consequently, the Third Circuit let the "principle of federal supremacy guide [it]," and resolved any doubt in favor of denominating the payment as a tax based upon the rationale that federal-type agencies are not subject to state agency jurisdiction. *Id.*

■ As to SEPTA, this analysis is inappropriate. SEPTA is not a federal agency, but a state agency challenging the ability of another state agency to ascribe to SEPTA responsibilities under state law.[10] Rather than dealing with supremacy and an intergovernmental dispute, SEPTA's challenge to the PUC's ability to impose maintenance responsibilities is more akin to an interagency dispute as to what agency will carry out the state's responsibility to the pub-

9. Panel decisions of the Third Circuit are not binding on Pennsylvania courts, even though a federal question is involved. *Commonwealth ex rel. Goodfellow v. Rundle*, 203 Pa.Superior Ct. 419, 434, 201 A.2d 615, 623, *transferred on other grounds to* 415 Pa. 528, 204 A.2d 446 (1964); *Cianfrani v. Johns–Manville Corp.*, 334 Pa.Superior Ct. 1, 6, 482 A.2d 1049, 1051 (1984).

10. *See Southeastern Pennsylvania Transportation Authority v. Commonwealth*, 41 Pa.Commonwealth Ct. 218, 398 A.2d 770 (1979).

lic.[11] Because of those differences and the fundamental differences we have with the Third Circuit's analysis,[12] we are required, taking into consideration the congressional intent when enacting that provision, to make our own analysis to determine the validity of SEPTA's contention that it is exempt from maintaining a bridge it owns under 45 U.S.C. § 581(c)(5).

To examine whether the imposition of maintenance responsibilities are taxes because they are imposed by the PUC, it is useful to examine how crossing maintenance would be accomplished if the PUC did not carry out that function. Prior to the establishment of the PUC, crossing maintenance at-grade, above-grade or below-grade, was accomplished by either private agreements setting forth those responsibilities or by special legislation setting forth the maintenance responsibilities when it gave the right for one entity to cross the right-of-way of another entity.[13] Absent

11. The PUC contends that 45 U.S.C. § 581(c)(5) exempting state agencies from "taxes and fees" is unconstitutional under the Tenth Amendment to the United States Constitution. Because we can avoid deciding this case on constitutional grounds, we will abstain from addressing this issue.

12. We disagree with the Third Circuit that a "special assessment" is a tax. Under Pennsylvania law, special assessments for linear improvements are made on the basis of who receives the benefits. *City of Philadelphia v. Philadelphia Transportation Authority*, 345 Pa. 244, 26 A.2d 909 (1942). An assessment cannot be imposed on property not, in fact, receiving a benefit. *Riehl v. Milcreek Township*, 64 Pa.Commonwealth Ct. 513, 441 A.2d 466 (1982). It is a burden or benefit one bears or receives incidental to one's ownership of land, not a tax or fee to support the public welfare. *See National Cable, supra.*

13. *See, e.g.*, Section 12 of the Act of February 19, 1847, P.L. 79, originally authorized the railroad to build the Woodland Avenue Bridge and also required the railroad to construct a crossing for the occupants of the land that the railroad tracks served. It stated, *inter alia*:

[I]t shall be the duty of such company to make or cause to be made, a good and sufficient cause way or causeways, whenever the same may be necessary to enable the occupant or occupants of said lands to cross or pass over the said, with wagons, carts and implements of husbandry, as occasion may require; and the same causeway or causeways, when so made, shall be maintained and kept in good repair by such company; and if the said company shall neglect or refuse, on request, to make such causeway or causeways, or when

PUC jurisdiction, if either of the parties failed to carry out its responsibilities, one of the parties could initiate an action to compel the other party to perform maintenance responsibilities so that traffic could safely pass through or over or under each other. This situation is analogous to a common driveway with shared maintenance responsibilities where if one party does not perform or agree to reconstruction, the other party can sue for specific performance.

The General Assembly, however, recognized that to ensure the safety of the public, a more rational method was needed to make certain that the parties who were obligated to carry out maintenance responsibilities did so, as well as to ensure that disputes between them as to who was responsible could be adjudicated with concern for the travelling public. To carry out that goal, the General Assembly entrusted the PUC with the power to initiate its own investigation of safety at crossings and order improvements to be made or maintenance accomplished to ensure the safety of the travelling public. For example, to make certain the safety of the public, the PUC has the power to order the installation of lights and gates at rail crossings and to assign the party responsible for payment and maintenance of improvements. In regard to bridges or tunnels, the PUC also has that same responsibility as an adjunct power to ensure the safety of the traveling public by assuring that those types of facilities do not collapse.

The PUC's imposition of maintenance costs on the parties who benefit from the crossing in no way meets the test of what is to be considered a tax as set forth by the Supreme Court in *National Cable* and by the Second Circuit in *City of New York*, where it was found that a tax is where a payment is imposed, regardless of the benefits received. No money from the PUC's imposition of maintenance responsibilities is used to support general government obligations, but is used to ensure that those who benefit from

made, to keep the same in good order, the same company shall be liable to pay any person aggrieved thereby, all damages sustained by such person in consequence of such neglect or refusal; . . . .

the crossing or who share that easement maintain it in a safe manner for the travelling public. The task which the PUC performs is not imposing a new responsibility on parties who benefit from the crossing, but in essence, only requires the parties to perform maintenance responsibilities that they would have even if the PUC did not impose them, because at common law or under legislation authorizing the construction of those facilities, the parties would still have those obligations. Akin to adjoining property owners responsibility for the maintenance of a "common driveway," the parties benefiting from a crossing always have the responsibility to maintain it, irrespective of how that maintenance is accomplished.

Accordingly, we find that SEPTA is not exempt under 45 U.S.C. § 581(c)(5) from the imposition of maintenance responsibilities for the substructure and superstructure of the Bridge.

### B.

■ SEPTA next contends that its own enabling statute contains a tax exemption provision which applies to SEPTA. Section 342 of the Pennsylvania Urban Mass Transportation Law (PUMTL); [14] 55 P.S. § 600.342, provides:

> The effectuation of the authorized purposes of any authority created under this article shall and will be, in all respects, for the benefit of the people of the Commonwealth, for the increase of their commerce and prosperity and for the improvement of their health and living conditions, and since such authority will be performing essential governmental functions in effectuating such purposes, *it shall not be required to pay any property taxes or assessments, of any kind or nature whatsoever, now in existence or to be enacted in the future, whether imposed by the Commonwealth or by any political subdivision thereof, or by any other taxing authority,* and the bonds issued by such authority, their transfer, and the income therefrom (including any profits made on

14. Act of January 22, 1968, P.L. 42, *as amended,* 55 P.S. § 600.342.

the sale thereof), shall at all times be free from taxation. (Emphasis added.)

SEPTA claims that its involuntary assumption of maintenance responsibility for the Bridge is a "property tax or assessment" from which SEPTA is exempt under Section 600.342. Like 45 U.S.C. § 546(b), "property taxes or assessments" contemplate those levies upon property to raise revenues to finance governmental functions. We reiterate that the maintenance allocations for the Bridge are neither "taxes" nor "assessments," which are formal administrative determinations of tax liability, but are merely a procedure to determine the costs of maintaining the Bridge among all parties concerned with the Bridge that they would have, absent PUC jurisdiction.

To illustrate the total inapplicability of those provisions to the PUC's imposition of maintenance responsibilities, it is to be noted that all governmental entities are similarly exempt from taxes and assessments. *See, e.g.,* Section 204, General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204. If we would adopt SEPTA's view that a PUC assignment of maintenance responsibilities is a tax, no one would be obligated to maintain the Bridge because the City would also be exempt from the imposition of maintenance responsibilities. Accordingly, we also find that SEPTA is not exempt from the maintenance responsibilities imposed by the PUC under Section 342 of the PUMTL.

### C.

Having determined that the tax exemption statutes at both the federal and state levels do not apply to SEPTA, we now turn to the question of whether the PUC properly ordered SEPTA to maintain at its own cost the complete substructure and superstructure of the Bridge. SEPTA first argues that the PUC was incorrect in finding that it owned the Bridge. To address this concern, it is necessary

to give a brief history of how this crossing was created.[15]

In 1747, the Council of Philadelphia received a petition regarding the status of what is now known as Woodland Avenue. At that time, the roadway had been in use for over sixty years. As a result of that petition, the road was surveyed and opened as a public road. In 1853, the Pennsylvania General Assembly enacted Act No. 718, which authorized the Governor to incorporate the Philadelphia and Baltimore Central Railroad. In 1854, that railroad, pursuant to authorization contained in Section 13 of the Act of February 19, 1854, constructed the original Woodland Avenue Bridge. In 1928, the now Philadelphia, Baltimore and Washington Railroad, a wholly-owned subsidiary of the Pennsylvania Railroad, constructed the present Woodland Avenue Bridge.

As the ALJ found, the records of the Pennsylvania Railroad, Terminal Division, and its successor, the Penn Central Railroad, state that the railroad owns and is responsible for maintaining the Woodland Avenue Bridge. Furthermore, the ALJ found that the deeds conveying the West Chester Branch (Line Code 1130) from the Trustee of the Philadelphia, Baltimore and Washington Railroad to Conrail and from Conrail to SEPTA, included the Woodland Avenue Bridge as part of the property conveyed. The ALJ concluded, and we agree, that because the chain of title to the Woodland Avenue Bridge is unbroken, SEPTA is the owner and is therefore responsible for primary maintenance.

 SEPTA contends that it is not required to bear the maintenance allocations imposed upon it by the PUC. SEPTA first argues that Sections 2702 and 2704 of the Public Utility Code are not applicable because SEPTA is a Commonwealth agency and not a "public utility" subject to PUC regulation.

15. SEPTA also contends that it cannot own the Bridge because it "merges" with the City street which the Bridge carries. We find no merit in that contention.

In 1985, the General Assembly revised the Code's definition of "public utility." The Code now defines "public utility" as inclusive of:

A municipal authority or transportation authority organized under the laws of this Commonwealth ... when it owns or operates, for the carriage of passengers or goods by rail, a line of railroad composed of lines formerly owned or operated by Pennsylvania Railroad, Penn Central Transportation Company, the Reading Company or the Consolidated Rail Corporation.

66 Pa.C.S. § 102(3). SEPTA fits squarely into the amended definition of "public utility" because it is a transportation authority organized under the PUMTL and because SEPTA owns and operates rail lines formerly owned and operated by the Pennsylvania Railroad and Conrail. Accordingly, SEPTA's contention that it is not a "public utility" is incorrect.

Even if the Code's definition of "public utility" had not been amended to include SEPTA, SEPTA would nevertheless be subject to PUC–imposed maintenance allocations because Section 2704(a) of the Code clearly provides that the PUC is authorized to allocate maintenance costs to public utilities, municipal corporations, *or to the Commonwealth*. Commonwealth agencies have been and still are allocated maintenance costs in highway-railroad crossings. *See, e.g., Commonwealth of Pennsylvania, Department of Transportation v. Pennsylvania Public Utility Commission*, 76 Pa.Commonwealth Ct. 525, 464 A.2d 645 (1983). SEPTA's status as a Commonwealth agency does not, therefore, relieve SEPTA from PUC ordered maintenance allocations. Because the PUC has authority to allocate maintenance costs to the Commonwealth and its agencies as well as to public utilities, SEPTA falls within the purview of the PUC's authority and is liable for maintaining the Bridge pursuant to 66 Pa.C.S. §§ 2702(b) and 2704(a).

SEPTA next contends that Sections 2702 and 2704 are inapplicable to SEPTA except where pure public safety matters are concerned. SEPTA contends that these sec-

tions do not apply because it does not consider matters of public safety to be at issue in the present proceeding.

The purpose of maintaining overhead highway bridges is to keep bridges in a safe condition for the general public. Our review of the record reveals that the PUC's investigation into matters pertaining to the maintenance of the Bridge was prompted by two prior PUC investigations, the purpose of which was to identify potentially hazardous and unsafe overhead highway bridges located throughout the Commonwealth. SEPTA's argument that public safety is not involved lacks merit because public safety considerations are a prime factor in bridge maintenance projects.

The allocation of maintenance costs is not unlike that of a "joint venture" in which the participants divide operating costs in order to maximize their share of the benefits. If the parties concerned with the overhead bridge, in this case, the City and SEPTA, do not participate in the "joint venture" of maintaining the Bridge, it is readily apparent that no one else would undertake the responsibility for maintaining the Bridge and the Bridge would eventually fall into disrepair and become unsafe for the general public. The PUC is entrusted with the responsibility to see that such a situation does not occur. Accordingly, we hold that the PUC properly ordered SEPTA to maintain the Woodland Avenue Bridge.

## II.

## THE CITY'S APPEAL

Although the City agrees that the PUC properly ordered SEPTA to maintain certain portions of the Bridge, the City also appeals from the PUC order contending that the PUC erred in ordering the City to maintain the entire bituminous wearing surface of the Bridge and the protective railings, curbs and sidewalks, both on the Bridge and on the highway's approaches to the Bridge. The City contends that because SEPTA is the abutting property

owner, SEPTA should be responsible for maintaining the railings, curbs, sidewalks and approaches to the Bridge.

Although the PUC properly found that SEPTA owns the Bridge, ownership of property is not dispositive of the issue of responsibility for maintaining that property. *See, e.g., Commonwealth of Pennsylvania, Department of Transportation v. Pennsylvania Public Utility Commission,* 79 Pa.Commonwealth Ct. 266, 469 A.2d 1149 (1983) (PUC assessment against PennDot of part of the cost of reconstructing a railroad-highway viaduct was permissible even though the road in question was not a designated state highway). In apportioning costs for construction, relocation and alteration of rail-highway crossings, the PUC is not limited to any fixed rule, but may take into consideration all relevant factors, with the only requirement being that the order be just and reasonable. *City of Philadelphia v. Pennsylvania Public Utility Commission,* 91 Pa.Commonwealth Ct. 123, 496 A.2d 924 (1985). Because a municipality is liable for the control of sidewalks, it is not unreasonable or unjust for the PUC to impose those responsibilities on the City.

The City also argues that it should not be held responsible for maintaining the highway approaches to the Bridge. It is well established that where a highway crosses a railroad right-of-way by means of a bridge, the authority of the PUC is not limited to the bridge structure, but extends to the highway approaches to the bridge as well. *Commonwealth of Pennsylvania, Department of Transportation v. Pennsylvania Public Utility Commission,* 64 Pa.Commonwealth Ct. 299, 440 A.2d 657 (1982). The PUC has not exceeded its authority to allocate costs for maintaining the highway approaches to the City.

The City contends that it is not responsible for maintaining the entire bituminous wearing surface of the Bridge as ordered by the PUC because of the Lease and Leaseback Agreement entered into between the City and SEPTA. In *Yackobovitz v. Southeastern Pennsylvania*

*Transportation Authority, Commonwealth of Pennsylvania, Department of Transportation of Pennsylvania and City of Philadelphia*, 139 Pa.Commonwealth Ct. 157, 590 A.2d 40 (1991), we found that under a Leaseback arrangement, SEPTA had responsibility for the roadbed between trolley tracks.

Because Section 2704(a) of the Code provides that "[t]he cost of construction, relocation, alteration, protection, or abolition of [a rail-highway] crossing ... shall be borne and paid [by the parties] in such proper proportions as the Commission may, after due notice and hearing, determine, *unless such proportions are mutually agreed upon and paid by the interested parties,*" (emphasis added) and the PUC did not have the benefit of our decision in *Yackobovitz,* we will remand for the PUC to determine maintenance responsibilities, and in view of the shared roadbed, the manner in which that responsibility will be accomplished.

## III.

The PUC determined that both SEPTA and the City derived a benefit from the presence of a separate railroad-highway crossing as opposed to an at-grade crossing. Because Woodland Avenue is a City street, the City has an interest in a safe, properly maintained wearing surface on the Bridge for both pedestrian and vehicular traffic. At the same time, SEPTA benefits from having trolley tracks on a properly maintained Bridge, and owns the Bridge which was built originally to accomplish the uninhibited use of its rail line. With the exception of allocation for roadbed maintenance, which we remand, the PUC's assignment of maintenance responsibilities of the Woodland Avenue Bridge between SEPTA and the City is just and reasonable.

An appropriate order will be entered.

## ORDER

AND NOW, this 3rd day of June, 1991, the order of the Pennsylvania Public Utility Commission, entered June 16,

1990, at No. I–870064, is affirmed, except for the extent that the City of Philadelphia was ordered to maintain the bituminous wearing surface of Woodland Avenue that is located between and adjacent to the Southeastern Pennsylvania Transportation Authority's trolley tracks on the Woodland Avenue Bridge which is remanded to the Commission for further proceedings consistent with this opinion.

Jurisdiction relinquished.