Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Pennsylvania Public Utility Commission et al., Respondents.

Philadelphia Suburban Water Company, Intervenor.

Argued November 20, 1981, before Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*Herbert G. Zahn,* Assistant Attorney General, with him *Stephen Dittman,* Assistant Counsel, *Ward T. Williams,* Chief Counsel-Transportation, *Jay C. Waldman,* General Counsel, and *Harvey Bartle, III,* Acting Attorney General, for petitioner.

*Barry J. Grossman,* Assistant Counsel, with him *Richard S. Herskovitz,* Assistant Counsel, *Alfred N. Lowenstein,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*David B. Gregor,* with him *Kenneth R. Myers* and *William N. Farran, III,* of counsel: *Morgan, Lewis & Bockius,* for intervenor, Philadelphia Suburban Water Company.

OPINION BY JUDGE ROGERS, January 29, 1982:

This case presents for our review one aspect of a protracted effort by Upper Merion Township, Montgomery County, Pennsylvania, to alleviate a hazardous condition created by a highway bridge spanning the railroad right-of-way of the Southeastern Pennsylvania Transportation Authority (SEPTA). Specifically, the Pennsylvania Department of Transportation (PennDOT) here challenges that portion of an order of the Pennsylvania Public Utility Commission, entered January 3, 1980, requiring PennDOT to reim-

burse the Philadelphia Suburban Water Co. for sixty per cent of the cost that utility will incur in the relocation of its facilities made necessary by a highway project proposed by PennDOT as a solution to the hazard created by the bridge.

The relevant facts are undisputed. In April, 1965, Upper Merion Township filed a complaint with the Commission naming as respondents, among others, SEPTA's corporate predecessor—the Philadelphia Suburban Transit Company, the Commonwealth Department of Highways (now PennDOT) and the Suburban Water Company and alleging the existence of a "condition . . . dangerous to the travelling public" at the location where State Highway Route 201 (also known as Old Gulph Road) crosses the railroad right-of-way then owned by the Philadelphia Suburban Transit Company by means of a forty foot long single span bridge constructed in 1911. A hearing was held at which the township's manager and engineer testified that the orientation of the bridge at an oblique angle to its highway approaches in combination with abrupt changes in grade and the narrow width of the bridge created limited visibility and continuing danger to motorists. The Department of Highway's grade crossing engineer agreed that the existing crossing was inadequate for the safety and convenience of the public, suggested that an engineering study be made to determine the most practical method of correcting the dangerous condition and requested nine months time to conduct such a study if the department was so ordered by the Commission.

In March, 1966, the Commission ordered the Department of Highways to prepare and submit, within nine months, plans and cost estimates for the reconstruction of the crossing. The department subsequently sought and was granted an extension of time for the preparation of the plans and in March, 1968,

submitted preliminary plans for certain reconstruction work to be performed on the bridge as well as a sketch plan for the possible relocation of Route 201 so as to permit all but local traffic to by-pass the bridge. By letter addressed to the department the township expressed its opinion that the highway relocation plan was the most satisfactory solution for the long term and that the township was willing to endure additional delay in alleviating the dangerous condition if such delay eventuated in the highway relocation. Thereafter, on August 23, 1971, the Commission, after noting that three years had elapsed following the submission of the highway relocation sketch without further progress with the project and that "[d]uring this time the township has displayed an extraordinary degree of patience and toleration in coping with the problems encountered with a bridge structure and highway approaches grossly inadequate to accommodate the essential needs of its people," ordered the department to take certain specified immediate action with respect to the maintenance of the bridge and to submit, along with SEPTA, a plan for the widening and strengthening of the bridge structure.

In October and November, 1971, hearings were held at which SEPTA's expert witness described various methods for the refurbishing of the bridge and ventured his opinion as to the relative feasibility of these methods concluding that the most feasible approach involved a decrease in the bridge's effective span accomplished by the structural addition at midspan of a cross beam and supporting beams attached to the existing abutments. Mr. Milton H. Davis, an assistant grade crossing engineer employed by the Department of Transportation, testified that the department had prepared no plans or cost estimates with respect to strengthening or widening the existing bridge structure and was unwilling to perform any work on the

bridge (other than to adjust the highway approaches in order to accommodate reconstruction work done by others) but that instead:

> [t]he department prefers to complete the design of the proposed relocation and improvement of Legislative Route 201 . . . The alignment of the main line of said relocation would by-pass crossing SEPTA's tracks.

The Commission responded, in May, 1972, by ordering *inter alia* that the department proceed with the relocation of Route 201 "in order to re-route a major portion of the highway traffic and by-pass the existing crossing therewith, generally in accordance with [the department's plan submission]." In addition, the Commission ordered SEPTA to prepare complete construction plans for the refurbishing and strengthening of the existing bridge in accordance with the method considered to be most feasible by SEPTA's expert in testimony adduced at the October 21, 1971, hearing and "at [SEPTA's] initial cost and expense, furnish all material and do all work necessary to alter the bridge structure, in accordance with the approved plan." The Commission reasoned:

> We are of the opinion that the existing bridge, presently posted for a load limit not exceeding 12 tons, is inadequate in its physical dimensions and structural capacity to accommodate safely the class of vehicular traffic normally using the highway at this location, and that the preliminary drawings prepared by the department, for relocation of State Highway Route 201 so as to bypass the crossing, are reasonable, of sound engineering principle, and generally acceptable to all parties in interest.

With regard to the facilities of public utilities other than SEPTA affected by the ordered construction activities, the Commission ordered

12. That any relocation of, changes in or removal of any adjacent structures, equipment or other facilities of any noncarrier public utility, which may be required as incidental to the execution of the crossing alteration, be made by said public utility, at its initial cost and expense, and in such manner as will not interfere with the repair or alteration of the structure.

and

20. That all costs and expenses incurred by any of the parties hereto be subject to allocation by this Commission after further hearing in this proceeding, which hearing shall be held at a time and place to be set by the Commission following completion of the railroad-highway crossing alteration.

Finally, the Commission in accordance with its general practice of accepting the jurisdictional limits proposed by the department, "tentatively limited [its] jurisdiction to that portion of the project between Highway Construction Engineering Stations 368+60 and 417+00" noting that "[s]ubsequent to the completion of a detailed plan by the department, a hearing will be scheduled for the purpose of taking testimony upon adoption of the plan, the allocation of the costs and expenses incident to construction and future maintenance, and any other matters pertinent to the relocation."

Some eighteen months thereafter the department submitted the required plans for the highway relocation as well as the descriptions, by metes and bounds, of the real property affected by the project. A field conference was conducted by the Commission in December, 1973, and attended by representatives of the parties at which time SEPTA contended that the bridge reconstruction which it had been ordered to accomplish ought not to commence until the completion

of the highway relocation project in order to avoid the necessity of establishing an adequate detour for the large volume of traffic then using the bridge. All other parties concurred in this assessment. A hearing was held on January 9, 1975, and Milton H. Davis, again presenting the position of the department, testified on cross-examination by the township's solicitor:

Q: ... the complaint was as to inadequacy of the structure to carry traffic: isn't [that] correct?

A: That's correct, sir.

Q: What you have done is to construct and design a new highway?

A: That's correct, sir, so that it will not— the main part of that traffic will not need to cross the tracks of the Philadelphia Suburban Transportation Company and SEPTA.

Q: You indicated, you said that if it had not been for the complaint, the problem would never have been alleviated by PennDOT in this community. . . .

A: Sir, I meant to say that if the existing complaint . . . was not initiated by the township or the commission, we would not have built the relocation.

. . . .

Q: So . . . you have solved the problem by constructing a new highway; isn't that correct?

A: That is, yes, that we have solved the problem by constructing a new highway to alleviate the new conditions that were talked about.

On November 12, 1975, the Commission issued a detailed order, over fifty pages in length, by which *inter alia* the department was ordered to proceed at its expense with the highway relocation project in accordance with the construction plans previously sub-

mitted, including the establishment of suitable detours and the demolition of existing structures and to complete the project no later than December 31, 1978; certain real properties were taken for the purpose of the project; and SEPTA was ordered, at the completion of the highway project, to refurbish and strengthen the bridge. In addition the Commission ordered:

8. That any relocation of, changes in or removal of any adjacent structures, equipment or other facilities of any public utility, other than Southeastern Pennsylvania Transportation Authority, located within the limits of any highway within the limits of this Commission's jurisdiction, which may be required as incidental to the execution of the improvement, be made by said public utility, at its sole cost and expense, and in such manner as will not interfere with the construction of the improvement.

9. That any relocation of, change in or removal of any adjacent structures, equipment or other facilities of any public utility, other than Southeastern Pennsylvania Transportation Authority, located beyond the limits of any highway within the limits of this Commission's jurisdiction, which may be required as incidental to the execution of the improvement, be made by said public utility, in such manner as will not interfere with the construction of the improvement.

. . . .

15. That Department of Transportation, at its sole cost and expense, pay any compensation for damages due to the owners, for property taken, injured or destroyed by reason of the construction of the crossing project, in accordance with this order.

. . . .

22.   That all costs and expense incurred by any of the parties hereto, in compliance with the Commission order issued May 8, 1972, be subject to allocation by this Commission after further hearing, which hearing shall be held at a time and place to be set by the Commission, following completion of the crossing alteration ordered therein.

Both PennDOT and the Suburban Water Company requested and were granted further proceedings for the purpose of modifying or clarifying the November 12, 1975 order. In its petition the water company asserted that many of its facilities affected by the highway project were located in private easements and that as to those facilities as well as other facilities located in the public right-of-way the Commission's order and particularly paragraphs numbered 8, 9, 15 and 22, reproduced above, was ambiguous with respect to reimbursement of the company for expenses it would incur in their required relocation. The Commission directed that the water company's petition be treated as a petition for reconsideration and modification and a hearing thereon was scheduled for December 12, 1978 at which time Mr. Robert A. Luksa testified for the company that the highway project necessitated the relocation of certain of the company's facilities both within and outside of the jurisdictional boundaries previously tentatively announced by the Commission, that the relocation of these facilities is devoid of any benefit to the company's consumers, and that the company is constitutionally entitled to just compensation for those of its facilities located within private easements which are required to be moved. Mr. Luksa summarized the position of the company by first noting that its facilities on the bridge are located exclusively within a private easement which would have qualified the company for full reimbursement if, as the township initially re-

quested, the bridge had been substantially reconstructed. Mr. Luksa then argued

> In lieu of reconstructing the subject bridge, as was originally planned, an alternative of relocating the highway was recommended and ultimately adopted not for the benefit of [Philadelphia Suburban Water Company] but to accommodate PennDOT, which, at the November 1971 hearing in this case, urged that it would be more economical to relocate the highway. . . . As a matter of fairness, the adoption of PennDOT's preferred approach to the problem of the subject crossing, thus raising [the water company's] costs, should not defeat reimbursement to which [the water company] is entitled.

On January 23, 1980, the Commission entered the order here challenged in which, as we have indicated, PennDOT was required to reimburse the water company for a portion of its cost attendant on the relocation of its facilities necessitated by the highway project. The Commission reasoned with regard to this issue:

> . . . The record is clear that said relocation, to alleviate the problems associated with an unsatisfactory condition created by a substandard bridge structure and by highway approaches with very hazardous horizontal and vertical alignments, was preferred by and deemed desirable by Department of Transportation in lieu of reconstructing the existing bridge and the highway approaches thereto to meet modern standards. Accordingly, we determine, upon reconsideration of this matter, the entire relocation project is a direct solution to providing the relief sought by the Complainant and is necessary to effectuate the prevention of accidents and the promotion of safety of the public. We

further determine that, if it were not for the highway relocation, it would not have been necessary for the involved non-carrier utilities to relocate their facilities required by virtue of said construction and inasmuch as it is apparent that the highway relocation is primarily intended to serve the needs of the highway user, rather than for the benefit of the utilities or their customers, that said utilities should not be burdened with having to pay the entire amount of their costs in relocating its facilities in public right-of-way. We also determine that the area over which this Commission limits its jurisdiction should be flexible so as to insure that fair and proper jurisprudence can be maintained by the Commission. Inasmuch as the record does not indicate that the Commission has ever set, other than tentatively, its limits of jurisdiction in the relocation project, we determine that our jurisdiction in this proceeding, as it relates to the highway relocation project, shall include all portions of the project, both laterally and longitudally, between Survey Stations 369+00 and 428+08, as said limits relate to work required by non-carrier utilities.

This extensive recitation of the facts is necessary because, in our judgment, PennDOT's present legal position, while of potential force in another context, is totally unpersuasive here. PennDOT argues that the Commission exceeded its statutory authority in the allocation of costs resulting from the relocation of Suburban Water Company's facilities necessitated by the rerouting of Route 201 because the highway relocation project is not within the Commission's jurisdiction. PennDOT concedes, as it must, that the Commission has been invested with exclusive jurisdiction to direct the construction, reconstruction, suspension,

alteration or abolition of railroad crossings. *Bartron v. Northampton County*, 342 Pa. 163, 19 A.2d 263 (1941); *Pittsburgh and Shawmut Railroad Co. v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 233, 14 A.2d 903 (1940). Section 2702(c) of the Public Utility Code, 66 Pa. C. S. §2702(c) provides in pertinent part:

> Upon its own motion or upon complaint, the commission shall have exclusive power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such [railroad] crossing heretofore or hereafter constructed to be relocated or altered, or to be suspended or abolished upon such reasonable terms and conditions as shall be prescribed by the commission. In determining the plans and specifications for any such crossing, the commission may lay out, establish, and open such new highways as, in its opinion, may be necessary to connect such crossing with any existing highway, or make such crossing more available to public use; and may abandon or vacate such highways or portions of highways as, in the opinion of the commission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any such crossings. The commission may order the work of construction, relocation, alteration, protection, suspension or abolition of any crossing aforesaid to be performed in whole or in part by any public utility or municipal corporation concerned or by the Commonwealth.

Where a highway crosses the railroad right-of-way by means of a bridge, the authority of the Commission is not limited to the bridge structure itself but extends to the highway approaches as well. *Pittsburgh and Shawmut Railroad Company, supra; Springettsbury*

*v. Pennsylvania Public Utility Commission,* 5 Pa. Commonwealth Ct. 102, 289 A.2d 762 (1972). Moreover, it is undisputed that with respect to railroad crossing projects within the Commission's jurisdiction, it has the exclusive power to apportion and allocate costs to the parties, including the Commonwealth. Section 2704(a) of the Public Utility Code, 66 Pa. C. S. §2704 (a) provides:

> . . . the cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided in this section, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the commission may, after due notice and hearing, determine . . .

PennDOT, emphasizing the phrase "at or adjacent to" in the above-quoted provision points out correctly that the highway project giving rise to the costs here at issue is physically removed from the bridge site subject to the township's 1965 complaint. However, the issue of whether particular costs result from construction ordered to be performed to alleviate a dangerous condition at a railroad crossing is one of fact for the Commission, *Bartron v. Northampton County, supra,* 342 Pa. at 169, 19 A.2d at 265; and properly turns on an assessment of all of the circumstances. *Springettsbury v. Pennsylvania Public Utility Commission, supra,* 5 Pa. Commonwealth Ct. at 105, 289 A.2d at 763. For example, in *Bartron v. Northampton County, supra,* the Commission ordered the allocation of real property condemnation costs resulting from the abolition of several railroad grade crossings and the construction of "a new main highway between the boroughs [of Portland and Slateford], a distance of about two miles." *Id.* at 165, 19 A.2d at 264. The Court of

Common Pleas held that the Commission had no jurisdiction to order the cost allocation because the costs at issue were "not the result of the abolition of the grade crossings but of the construction of the new portion of the highway between the two boroughs. . . ." The Supreme Court reversed reasoning that the county had not appealed from the order establishing initially the proportion of costs for which the county was to be responsible and that "[o]n this record we must regard the order of the Commission as predicated on its conclusion that the new section of the highway was required as part of the change immediately necessitated by the separation of the grades and not as something merely accompanying the change: compare Erie Railroad Company v. Public Service Commission, 77 Pa. Superior Ct. 196 [(1921)]; Somerset County v. Public Utility Commission, 132 Pa. Superior Ct. 585, 1 A.2d 806 [(1938)]." *Id.* at 166, 19 A.2d at 264. *See also, Pennsylvania Public Utility Commission v. Souderton Borough,* 210 Pa. Superior Ct. 22, 231 A.2d 875 (1967) upholding the Commission's jurisdiction over an extensive highway and rail relocation project intended, ultimately, to reroute six miles of railroad right-of-way so as to by-pass the borough, and *Springettsbury v. Pennsylvania Public Utility Commission, supra,* upholding the power of the Commission to order the erection of traffic signals some 3,500 feet distant from a highway railroad bridge.

In the case *sub judice* the Commission found that "the entire highway relocation project is a direct solution to providing the relief sought by the [Township] and is necessary to effectuate the prevention of accidents and the promotion of safety of the public." This finding, to which PennDOT chiefly objects, is supported by the record and is not contradicted by PennDOT's late assertions, without evidentiary support, that the project it proposed and submitted as an undi-

vided whole perhaps should have been presented in several segments distinguishable on the basis of their varying proximity to the hazardous bridge.

On this issue we are in complete agreement with the Commission that the record supports no conclusion other than that the Commission, exercising its statutory mandate, ordered PennDOT to address the public hazard created by the inadequate bridge and that the highway project encompassing the relocation of Route 201 was proposed by PennDOT as an alternative response to the Commission's order. Thereafter, for over a decade, PennDOT, the Commission and the other parties to these proceedings, including the township complainant, predicated their actions on the understanding that the highway relocation project was a substitute for the extensive bridge reconstruction that would otherwise have been required and that the whole of the highway relocation project was within the Commission's jurisdiction as necessary to correct the hazardous condition at the bridge and its approaches. While it is possible that PennDOT could have in the course of the many hearings held during this period adduced evidence supportive of the conclusion that portions of the highway relocation project were occasioned by concerns other than those expressed by the township with respect to the inadequate bridge, such evidence was not produced and justice would not be served by the additional delay in the cure of this public hazard which would result from allowing PennDOT now to attempt to establish facts it must have considered unworthy of attention during the last decade.

*Somerset County v. Public Utility Commission,* 132 Pa. Superior Ct. 585, 1 A.2d 806 (1938), to which reference is made by the Court in *Bartron* and on which the appellant here relies is not to the contrary. In *Somerset County* the record clearly established that much of the five mile highway project there at issue

was intended by the Department of Transportation to address hazardous road conditions including worn macadem, steep grades, and sharp curves removed from and unrelated to the railroad crossings ordered to be eliminated by the Public Utility Commission. Therefore, the Superior Court remanded the record to the Commission, holding that:

The commission erred in . . . fail[ing] to give proper consideration to a determination of the point at which this undertaking ceased to materially concern the relocation of the grade crossings and to take into account the admitted facts showing that the project as a whole and the major portion of. its parts, even within a limit of two miles, was not incident to the grade crossing elimination but was clearly a relocation of a state highway where many of the changes were being made for reasons entirely divorced from the relocation of the crossings.

In contrast, as we have indicated, there is no evidence in this record that any portion of the highway relocation project proposed by PennDOT was made necessary by anything other than the hazard posed by the inadequate highway railroad bridge, and, indeed, the testimony of PennDOT's expert witnesses has been consistently to the effect that the whole of the project was designed to remedy the hazard at the bridge and that in the absence of the inadequate bridge no portion of the project would have been undertaken. Accordingly, we enter the following

ORDER

AND Now, this 29th day of January, 1982, the order of the Public Utility Commission is affirmed; the prayer of the Pennsylvania Department of Transportation's Petition for Remand is denied.

Judge PALLADINO did not participate in the decision of this case.