v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**SPRINT COMMUNICATIONS COMPANY L.P., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 30, 1998.

Decided March 18, 1998.

Craig A. Doll, Harrisburg, for petitioner, AT&T.

Kevin J. McKeon, Harrisburg, for petitioner, Sprint Communications.

Lawrence F. Barth, Harrisburg, for respondent.

Christopher D. Loizides, Philadelphia, for intervenor, Delaware & Hudson Railway Co., Inc.

Before SMITH and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

AT&T and Sprint Communications Company L.P. (Sprint) [1] appeal an order of the Pennsylvania Public Utility Commission (Commission) [2] denying them reimbursement

---

1. The Delaware and Hudson Railway Company, Inc. has filed a brief as an intervenor in this matter.

2. This case was originally argued before this Court on September 8, 1997, and an opinion was

filed on October 16, 1997. Because the parties requested and were granted reconsideration of the matter and we interpreted Sections 508 and 2704 of the Public Utility Code (Code), 66 Pa. C.S. §§ 508 and 2704, in a way not advanced by

of their costs for relocating fiber optic cables at five rail-highway crossings.[3]

## I.

This case emanates from the need by Delaware and Hudson Railway Company, Inc. (Delaware and Hudson) to lower railroad tracks at a number of rail-highway crossings in northeastern Pennsylvania to accommodate double stack container railroad cars. Because the Pennsylvania General Assembly wanted to promote commerce within the Commonwealth by modernizing its railways, it enacted legislation to subsidize rail freight carriers to undertake a rail clearance project that would allow the railroads to double stack container cars on the rail lines. To subsidize Delaware and Hudson in the rail lowering project at three below-grade rail-highway crossings in the City of Scranton and at two below-grade rail-highway crossings in Nicholson Township, a Rail Clearance Agreement was entered into between the Commonwealth of Pennsylvania, acting through the Department of Transportation (Commonwealth), Consolidated Rail Corporation (Conrail) and Delaware and Hudson. The Commonwealth agreed to fund up to 30% of Delaware and Hudson's and Conrail's costs in completing the project, subject to a spending cap of $1,260,000 for alterations to their portion of the project which involved the track from the New York state line to Control Point Burn in the City of Allentown.

On October 6, 1993, Delaware and Hudson filed an application with the Commission requesting exemptions [4] from the 22-foot minimum overhead clearance above a railroad track as required by 52 Pa.Code § 33.121(a) [5] at three crossings in the City of Scranton [6] and at two below-grade rail-highway crossings in Nicholson Township which cross over the 3,600 foot long Nicholson Tunnel.[7] At the five crossings, fiber optic cables of either AT&T or Sprint or both which were previously installed were required to be relocated as a result of lowering the tracks. The Commission issued an interim order approving the requested exemptions and instructing Delaware and Hudson to advise the Commission when the alterations were completed so that a formal hearing could be held to determine the allocation of costs incurred among the parties as a result of the alterations.[8]

---

any of the parties, the opinion was withdrawn and the case is again before this Court for consideration. We asked the parties to specifically address the following issues:

- The source of the Commission's power to abrogate existing maintenance agreements at crossings;
- The discretion of the Commission to apply or not to apply Section 508 of the Code; and
- The proper interpretation of Section 508 of the Code.

3. A rail-highway crossing is the intersection of a highway with a railroad's right-of-way upon which railroad tracks lie and can be at, above or below the grade of the railroad tracks. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 140 Pa. Cmwlth. 270, 592 A.2d 797, 808 (1991), *petition for allowance of appeal denied*, 531 Pa. 642, 611 A.2d 714 (1992).

4. Section 2702(a) of the Code, 66 Pa.C.S. § 2702(a), provides in relevant part:
 No public utility, engaged in the transportation of passengers or property, shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or across any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order,

shall be so constructed across the facilities of any such public utility . . .

5. Section 33.12(a) of the Code provides:
 Minimum overhead clearances above railroad tracks, used or proposed to be used for transporting freight cars, shall be 22 feet, except as provided in this Subchapter.

6. Specifically, they were the crossing where Railway's main line crosses, below grade, Linden Street, State Route 3020; the crossing where Railway's main line crosses, below grade, Lackawanna Avenue; and the crossing where Railway's main line crosses, below grade, Eynon Street.

7. Those crossings were located where Delaware and Hudson's main line crosses, below grade, State Route 1014, which is 40 feet wide, and at the crossing where Delaware and Hudson's main line crosses, below grade, Township Road 554, which is 50 feet wide.

8. The alterations to the three rail-highway crossings in the City of Scranton cost Delaware and Hudson $340,832.15 and they received a reimbursement of $102,249.65 from the Commonwealth, leaving a net cost of $238,582.50. Regarding the alterations to the two rail-highway

However, until that time, the Commission ordered each party to bear its own costs of reconstruction and relocation.

The fiber optic cables were located in the Delaware and Hudson right-of-way as a result of agreements entered into with Guilford Transportation Industries, Inc. (Guilford) or its subsidiary, D&H.[9] Sprint and Guilford entered into a Fiber Optic Easement Agreement (Easement Agreement)[10] in 1986 that allowed Sprint to place its cables in the Delaware and Hudson right-of-way. Under the Easement Agreement, the crossings that affected Sprint's cables were along the right-of-way at the Linden Street rail-highway crossing in Scranton and in the Nicholson Tunnel. If Sprint were required by Guilford to move its cables, Guilford would reimburse its costs.[11] In 1990, AT&T entered into a similar agreement with Guilford's subsidiary, D&H.[12] Unlike Sprint, AT&T agreed to relocate its cables at its own cost and expense if D&H deemed a relocation necessary.[13]

As a result of the Commission's order that each party was to bear its own costs, Sprint relocated its cables along Delaware and Hudson's right-of-way and temporarily in the Ni-

cholson Tunnel at a total cost of $232,353.81. AT&T relocated its cables along the right-of-way and temporarily in the Nicholson Tunnel at a total cost of $136,451. AT&T and Sprint intended to share the cost for permanently relocating their cables in a shared common facility in the Nicholson Tunnel[14] at an expected total cost of $1,654,217.25.

After the alterations were completed, a hearing was held before an Administrative Law Judge (ALJ) regarding the allocation of costs incurred by Delaware and Hudson, AT&T and Sprint. AT&T and Sprint argued that the Commission did not have jurisdiction to allocate costs, but if it did, they were entitled to 100% reimbursement of their costs of relocating their cables, including those associated with relocating their cables throughout the entire length of the Nicholson Tunnel. They argued that they were forced to relocate their cables, did not benefit from the relocation, and the Commission had previously reimbursed costs in similar situations. Additionally, they argued that there were state and federal funds available, specifically, those funds given by the Commission to Delaware and Hudson to pay its costs.

crossings as well as to the entire Nicholson Tunnel, Delaware and Hudson incurred costs of $492,495.63 and received a reimbursement of $101,931.43 from the Commonwealth, leaving a net cost of $390,564.20. The Commonwealth ultimately made an aggregate reimbursement to Delaware and Hudson and Conrail in the amount of $1,260,000.

9. Guilford owned D&H, the "old" Delaware and Hudson Railway Company, at the time the agreement was executed. In 1988, Guilford and D&H filed for bankruptcy. For purposes of this opinion, we will refer to all pre-bankruptcy matters involving the "old" Delaware and Hudson Railway Company as "D&H." Because in 1991, Delaware and Hudson acquired almost all of D&H's assets from the trustee in bankruptcy of D&H through an Asset Purchase Agreement, we will refer to D&H as Delaware and Hudson regarding any post-bankruptcy matters, including those involving AT&T.

10. Sprint was formerly known as U.S. Telecom at the time the Easement Agreement was entered into with Guilford.

11. Article 21 of Sprint's Easement Agreement provides the following:

If Guilford determines that any of the Facilities of U.S. Telecom [Sprint] must be relocated,

changed or altered because of the operations or activities of any of the Railroads, Guilford shall promptly notify U.S. Telecom. US Telecom shall protect or move the affected U.S. Telecom Facilities in a manner satisfactory to Guilford as soon as practicable and *at the expense of Guilford.* (Emphasis added.)

12. Because Guilford and D&H were in bankruptcy, apparently either a debtor of D&H in possession or a bankruptcy trustee entered into the agreement on behalf of D&H and the Easement Agreement was assigned to Delaware and Hudson.

13. Article 21 of AT&T's Easement Agreement provides:

If Railroad [D&H] determines that any of the Facilities of AT&T must be relocated, changed or altered because of the operations or activities of Railroad, Railroad shall promptly notify AT&T. AT&T shall relocate, change or alter the affected AT&T Facilities in a manner satisfactory to Railroad as soon as practicable and *at the expense of AT&T.* (Emphasis added.)

14. Both Sprint and AT&T originally located their cables in the subsurface of the tunnel passageway. They relocated the cables on a temporary basis to the wall of the tunnel.

■ The ALJ initially determined that the Commission had subject matter jurisdiction over this matter pursuant to Sections 2702 and 2704 of the Code. She then determined that the jurisdiction extended to all of the rail-highway crossings, but not over the entire 3,600 feet of the Nicholson Tunnel. Rather, it only had jurisdiction over the crossings at the points where the highways physically crossed over the tunnel. The ALJ then found that the Commission had jurisdiction over the allocation of costs, and considered various factors in deciding whether any of the parties were entitled to reimbursement of their costs, including the lack of government funds available for reimbursement.[15] While she acknowledged the Easement Agreements between AT&T and D&H and Sprint and Guilford in allocating costs, she abrogated those Easement Agreements in concluding that none of the factors, including the Easement Agreements, warranted

that any of the relocation costs of either AT&T or Sprint be borne by Delaware and Hudson.[16] The ALJ recommended to the Commission that Delaware and Hudson, as well as AT&T and Sprint, were each responsible for their own costs. The Commission adopted the recommended decision of the ALJ and this appeal by AT&T and Sprint followed.[17]

■ AT&T and Sprint contend that the Commission's order contains no rationale for denying their relocation costs and should either be remanded for further explanation or reversed.[18] Specifically, they argue that while the Commission identified five factors that it considered relevant to the issue of cost apportionment, it failed to state how any one of the factors affected its decision to deny reimbursement costs, including the Easement Agreements that were ignored in the process.[19] They also argue that although

15. The other factors that the ALJ considered were whether the utilities had obtained authorization for their cables to occupy the crossings; whether reimbursement was precluded because the utilities' facilities were located in private right-of-ways; and whether the utilities had improved their facilities by relocating.

16. The ALJ stated that "due to the uncertain applicability and interpretation of any potential cost apportionment agreements regarding Sprint's relocation costs … I shall not look to the words of either the March 25, 1986 easement agreement or the July 13, 1990 asset purchase agreement." (ALJ's recommended decision at pp. 49–50.)

17. Our scope of review is limited to determining whether the Commission violated constitutional rights, committed an error of law or made findings unsupported by substantial evidence. *White Rock Sewage Corporation v. Pennsylvania Public Utility Commission*, 133 Pa.Cmwlth. 608, 578 A.2d 984 (1996).

18. AT&T also argues that the easement it holds is property compensable in eminent domain, and because it was forced to relocate its cables, there was taking of its property without just compensation. However, we do not believe that there has been any taking in this case because not only does AT&T still have use of its easement, there cannot be a taking when AT&T has no right to compensation under its own Easement Agreement. In effect, AT&T is arguing reverse condemnation because it wants us to order the Commission to allocate money from another party not responsible for the costs to AT&T. This we will not do.

19. They argue that the Commission misinterpreted the availability of public funding. However, they fail to acknowledge that the Rail Clearance Agreement was between the Commonwealth, Conrail and D&H Railway, and it provided that the Commonwealth would reimburse Conrail and D&H Railway for up to 30% of their costs for railroad line alterations with a cap of $1,260,-000. It did not mention the utilities. The Commonwealth made an aggregate reimbursement of $1,260,000 to those parties. Even though AT&T and Sprint argue that the Commission could have ordered D&H Railway to reimburse them for their costs, such an action would violate the Rail Agreement. Moreover, the impetus for utilizing federal funds appears to arise from the Federal–Aid Highway Act of 1944 (58 Stat. 838). Section 5 of that Act makes federal funds available to states for costs of reconstruction of crossings and limits the liability of railroads. *See Department of Highways v. Pennsylvania Public Utility Commission*, 185 Pa. Superior Ct. 418, 138 A.2d 143 (1958); *Department of Highways v. Pennsylvania Public Utility Commission*, 179 Pa. Superior Ct. 376, 116 A.2d 855 (1955). No cases exist concerning the allocation of state funds for the same use. As for their argument that the ALJ only considered funding when deciding how to allocate costs, this clearly was not the case based on the ALJ's lengthy discussion involving the four other factors. Regarding their contention that the Commission incorrectly determined that the parties were required to receive prior approval of the location of their facilities at the Scranton and Nicholson Township rail-highway crossings, the Commission stated that even if prior approval had been required, the utilities would not be precluded from reimbursement be-

Section 508 of the Code provides the Commission with the general authority to interpret and modify contracts involving utilities,[20] Section 2704 of the Code specifically deals with contracts involving rail-highway crossings and costs should have been apportioned under that provision because they had not been "paid." However, while the Commission addressed AT&T's Easement Agreement with Delaware and Hudson, Sprint points out that the Commission never made any finding regarding its contract with Delaware and Hudson, which it argues survived bankruptcy, making Delaware and Hudson responsible for its costs.[21]

## II.

The Commission has exclusive jurisdiction over matters involving rail-highway crossings.[22] *Pittsburgh & Lake Erie Railroad Company v. Pennsylvania Public Utility Commission*, 66 Pa.Cmwlth. 609, 445 A.2d 851 (1982). Section 2702 of the Code, 66 Pa.C.S. § 2702, governs the Commission's jurisdiction over rail-highway crossings and provides that the Commission has exclusive power to govern the construction, relocation, suspension and abolition of such crossings.[23] The Commission has also been given power

under Section 508 of the Code to abrogate agreements entered into between public utilities and municipal corporations to carry out its functions under the Code.

Normally, a government agency does not have the authority to abrogate or reform contracts between private parties because that would be an *ex post facto* impairment of a contractual obligation that was entered into through arms-length negotiations by the parties.[24] *Harristown Development Corporation v. Department of General Services*, 135 Pa.Cmwlth. 177, 580 A.2d 1174 (1990). However, an exception is made to this general rule for the Commission because a public utility's location of its facilities within a public right-of-way is merely a privilege that is, by definition, revocable. No matter the terms of an agreement, because the right-of-way is held by the public body for public purposes, a utility does not have a proprietary interest in the permanent location of its facilities in the right-of-way. *Bell Atlantic–Pennsylvania, Inc. v. Turnpike Commission*, 703 A.2d 589 (Pa.Cmwlth.1997).

The express authority given to the Commission to abrogate agreements is found under Section 508 of the Code which provides

cause their facilities were located in a private right-of-way.

**20.** *See* Sprint's original brief at p. 17, footnote 41 and AT&T's brief for reconsideration at p. 9.

**21.** While the parties argue that the Commission erred in determining that they would benefit by the permanent relocation because they would be improving their respective facilities by significantly and permanently enhancing the protection of their fiber optic cable at the crossings, the Commission is the finder of fact and determiner of credibility. *Consolidated Rail Corporation v. Pennsylvania Public Utility Commission*, 155 Pa. Cmwlth. 537, 625 A.2d 741 (1993). Because the Commission found that AT&T and Sprint were going to benefit from the relocation of their cables, we cannot disturb that finding.

**22.** AT&T and Sprint also contend that the Commission had jurisdiction over the entire Nicholson Tunnel, not just over the crossings of State Route 1014 and Township Road 554 as set forth in its order. In support of that contention, they direct our attention to *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission (SEPTA I)*, 140 Pa.Cmwlth. 270, 592 A.2d 797, 804 (1991), *petition for allow-*

*ance of appeal denied*, 531 Pa. 642, 611 A.2d 714 (1992), where this Court held that the Commission had jurisdiction over tunnels because it has the authority to allocate costs associated with proceedings involving tunnels. Additionally, in *Department of Transportation v. Pennsylvania Public Utility Commission*, 64 Pa.Cmwlth. 299, 440 A.2d 657 (1982), this Court held that the Commission had jurisdiction over bridges and the highways that crossed over them and had the authority to allocate costs associated with the relocation of utility facilities as a result of alterations to the highway and bridge. Because a bridge is essentially no different than a tunnel for purposes of jurisdiction when highway crossings are involved, we agree that the Commission had jurisdiction over the entire Nicholson Tunnel.

**23.** That section also provides the Commission with exclusive power to appropriate property for rail-highway crossings.

**24.** Article I, Section 17 of the Pennsylvania Constitution provides:

No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed.

the Commission with general power to change the terms of all agreements between public utilities and private parties whether they deal with rail-highway crossings or other issues related to public utilities. That section provides:

> The commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any· person, corporation, or municipal corporation, which *embrace or concern a public right,* benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or *concerned with the public interest and the general well-being of this Commonwealth.* Whenever the commission shall determine, after reasonable notice and hearing, upon its own motion or upon complaint, that any such obligations, terms, or conditions are unjust, unreasonable, inequitable, or otherwise *contrary or adverse to the public interest and the general well-being of this Commonwealth,* the commission shall determine and prescribe, by findings and order, the just, reasonable, and equitable obligations, terms, and conditions of such contract. (Emphasis added.)

Not wanting to interfere with market place decisions made by the parties regarding their various responsibilities, the General Assembly provided that the Commission had to determine that an agreement was adverse to the public interest before making any changes.

### III.

 At common law, utilities were permitted to occupy highway right-of-ways without cost but could be ordered by the state or a municipal agency to remove and relocate their facilities at their own cost and expense. *Bell Atlantic–Pennsylvania, Inc. v. Turnpike Commission.* The purpose of Section 2704 of the Code was to change the presumption that utilities were responsible for their own relocation costs. Section 2704 of the Code provides in relevant part: [25]

> The compensation for damages which the owners of adjacent property taken, injured, or destroyed may sustain in the construction, relocation, alteration, protection, or abolition of any crossing under the provisions of this part, shall, after due notice and hearing, be ascertained and determined by the commission. *Such compensation, as well as the cost of . . . relocation . . . of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid . . . by the public utility . . . unless such proportions are mutually agreed upon and paid by the interested parties.* (Emphasis added.)

Not only did Section 2704 of the Code change the common law rule by allowing a utility to be reimbursed for its costs, but it also divested the Commission of jurisdiction when the

**25.** Regarding this section of the Code, we explained in *City of Philadelphia v. Pennsylvania Public Utility Commission,* 676 A.2d 1298, 1306, footnote 14 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 546 Pa. 657, 684 A.2d 558 (1996), *cert. denied,* ── U.S.──, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997):

> With the enactment of the Public Service Company Law in 1913, Act of July 26, 1913, P.L. 1374, *formerly,* 66 P.S. §§ 571–577, repealed by the Act of May 28, 1937, P.L. 1053, the State exerted its police power through regulatory controls over public utilities, giving the Public Service Commission modified but exclusive jurisdiction over the construction of rail-highway crossings and the abolition of dangerous conditions. *Westmoreland Chemical & Color [Co. v. Public Service Comm.],* 294 Pa. [451] at 457, 144 A. [407] at 408 [1928]. Section 12 of the Public Service Company Law stated that the expenses of the relocation, alteration or abolition of any crossing:

> > shall be borne and paid, as hereinafter provided, by the public service company or companies or municipal corporations concerned, or by the Commonwealth, either severally or in such proper proportions as the Commission may, . . . determine.

> However, if the parties came to an agreement about the payment for such changes and then defaulted on the agreement, the Commission was empowered to contract for the work to be done and then to recover the costs "as debts of like amount are now by law recoverable, from the public service company or companies" in the proportions determined by the Commission. Section 12 of the Act of July 26, 1913, P.L. 1374. Section 12 was replaced by Section 411 of the Public Utility Law of 1937, repealed by the Act of July 1, 1978, P.L. 598.

relocation costs were "paid" by agreement between the parties. Section 2704 did not, however, give the Commission power to abrogate an agreement.

We granted reconsideration because all of the parties disagreed with this interpretation. AT&T, because it wants its freely negotiated agreement modified; Delaware and Hudson, because it does not want the Commission's decision reversed; the Commission, because it apparently believes it has plenary power to vacate agreements without giving reasons;[26] and even Sprint, who in its petition for reconsideration recognized that it may win but apparently is looking forward to future cases, argue that Section 508 only applies to cases involving rates, not rail-highway crossings, and only Section 2704 applies.

The interplay between these two sections was examined by our Supreme Court in *City of Philadelphia v. Pennsylvania Public Utility Commission (Philadelphia I)*, 449 Pa. 402, 296 A.2d 804 (1972), *reversed in part* by *City of Philadelphia v. Pennsylvania Public Utility Commission (Philadelphia II)*, 504 Pa. 312, 473 A.2d 997 (1984). *Philadelphia I* addressed the issue of the Commission's power to abrogate agreements in the context of rail-highway crossing cases and the application of Sections 508 and 2704 to such cases. It held that where an agreement existed between parties regarding cost allocation of work done to rail-highway crossings and costs were paid pursuant to an interim order issued by the Commission, the Commission was divested of jurisdiction to consider the allocation of costs between those parties.

The Court stated that the Commission was not authorized to impair pre-existing contractual rights except when the contracts adversely affected the public welfare:

> This Court has limited the contractual abrogation ambit of the Commission to particular circumstances. The Commission's power to set aside contracts does not apply to a contract which *does not affect the common welfare by directly influencing rates or actual operations of the public utility.* (Emphasis added.)

*Id.* at 410, 296 A.2d at 808.

In determining the standard to be used when considering whether the agreement affects the public interest, the Court held that "the Commission's power to set aside contracts does not apply to a contract that does not affect the common welfare by directly influencing rates or actual operations of the public utility."[27] *Id.*

Because it wanted to limit its expansive holding of what was considered "paid", in *Philadelphia II,* the Supreme Court reversed that portion of the opinion by holding that an agreement was only "paid" under Section 2704(a) of the Code when one of the parties to the agreement had *voluntarily* paid for the costs of relocation or reconstruction and not pursuant to an interim or final Commission order. It then concluded that because no payment of relocation costs had been made, the Commission retained jurisdiction under section 2704(a) of the Code to allocate costs.[28]

---

26. The Commission contends that all Section 2704 requires is that it allocate costs—agreement or no agreement. In its application for reargument, it states at pp. 5–6: "[I]f no payments have been made, it doesn't matter if the contract was valid or if the public interest requires the contract to be amended or abrogated—the PUC is directed by the statute to determine the allocation of costs." The allocation of costs by the Commission would appear to be a first step because it contends that regardless of the outcome of this case, the parties would not be stopped "from seeking payments through a civil suit to enforce whatever cost-sharing or costs-allocation agreements the parties may have established by private contract." (P. 10 of Commission's brief on reconsideration.) In other words, the Commission is saying that its jurisdiction is not exclusive in determining rates and if the parties want

to litigate elsewhere, they are free to do so. No support was offered for that proposition.

27. 66 Pa.C.S. § 102 defines public utility as:

> (1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:
> (vi) Conveying or transmitting messages or communications by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public compensation.

28. *See also Octoraro Railway, Inc. v. Pennsylvania Public Utility Commission,* 85 Pa.Cmwlth. 283, 482 A.2d 278 (1984).

While our Supreme Court in *Philadelphia II* changed its prior position as to what constituted "paid" from any payment made pursuant to a Commission interim order to those situations where payment had been made voluntarily, nothing in that opinion vitiated its holding that under Section 508 of the Code, the Commission could only abrogate an agreement that was not in the public interest. Notably, in a concurring opinion, Justice Hutchinson wrote separately to emphasize the Commission's "full power" over agreements involving rail-highway crossings, stating that the Commission had the general power to revise and reform the terms of the agreements when they affected the public interest under Section 508 of the Code.

▰ In conclusion, Section 508 is the grant of power by the General Assembly to the Commission to abrogate an agreement between a public utility and any other party when it is not in the public interest. Section 2704 is not an additional grant of power, but is a limitation on the Commission's power to change agreements between parties because it divests the Commission of jurisdiction to review an agreement specifically discussing allocation of costs incurred relative to rail-highway crossings when the parties have mutually agreed to the allocation of costs and those costs have been paid. Because *Philadelphia I* and *Philadelphia II* support the Commission's authority to abrogate agreements involving rail-highway crossings with a limited exception, the parties' argument that Section 508 does not pertain to such agreements is erroneous.

### IV.

The Commission argues that based on the way it interprets Section 508, that section is inapplicable to this case. It contends that the General Assembly does not require it to apply Section 508 when it abrogates agreements, pointing to the language in that section which states that the Commission "shall have power and authority" to change the terms of an agreement. It avers this language does not mandate it to act but merely

gives it discretion to act and for that reason, we should defer to its interpretation.

▰ In *Bethenergy Mines v. Department of Environmental Protection*, 676 A.2d 711, 715 (Pa.Cmwlth.1996), we discussed at length an agency's discretion to interpret and administer its own statutes, stating the following:

When reviewing agency interpretations of statutes they are charged to enforce our Supreme Court in *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 455 Pa. 52, 313 A.2d 156 (1973) (as well as the United States Supreme Court in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), has adopted a "strong deference" standard for reviewing agency interpretations of statutes they are charged to enforce. *Pennsylvania Elec. Co. v. Pennsylvania Public Utility Com'n*, 166 Pa.Cmwlth. 413, 648 A.2d 63 (1994), *petition for allowance of appeal denied*, 542 Pa. 680, 668 A.2d 1141 (1995). Under the "strong deference" standard, if we determine that the intent of the legislature is clear, that is the end of the matter and we, as well as the agency, must give effect to the unambiguously expressed intent of the legislature. If, however, we determine that the precise question at issue has not been addressed by the legislature, we are not to impose our own construction on the statute as would be necessary in the absence of an administrative interpretation, but review the agency's construction of the statute to determine whether that construction is permissible. *Pennsylvania Electric Company v. Pennsylvania Public Utility Company*. We must give deference to the interpretation of the legislative intent of a statute made by an administrative agency only where the language of that statute is not explicit or ambiguous. 1 Pa.C.S. § 1921(c)(8). A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations. *Drummond v. University of Pennsylvania*, 651 A.2d 572 (Pa. Cmwlth.1994), *petition for allowance of appeal denied*, 541 Pa. 628, 661 A.2d 875 (1995).[29]

29. Pennsylvania is one of 12 states, along with

the federal government, that gives "strong defer-

In this particular case, the language in Section 508 of the Code is clear and unambiguous. The language, "shall have the power and authority" plainly means that the Commission has the power to abrogate agreements if it so desires, but that it is not required to do so when it finds it is not in the public or ratepayer interests. Section 508 contains no language that the provision is "optional"—i.e., that it only applies when the Commission deems it applicable, and there is some other inherent power that it can use to abrogate, modify or ignore agreements when it decides not use Section 508. Because the language of Section 508 is clear and unambiguous, the Commission was required to give effect to the expressed intent of the General Assembly. Here, the General Assembly has specifically told the Commission that when any terms or conditions of an agreement are "unjust, unreasonable or inequitable, or otherwise contrary or adverse to the public interest and general well-being of the Commonwealth" it shall determine the terms and conditions that will rectify that situation.

In a similar vein, the Commission argues that according to the specific language of Section 508, either it or one of the parties must make a motion or file a complaint under that section in order for it to have any application. Because none of the parties made a motion or filed a complaint, the Commission contends Section 508 has no application.

However, that argument ignores that the Commission took it upon itself to abrogate the agreements. Because this is the only provision that authorizes it to abrogate agreements, the Commission made the motion, but without giving the statutorily mandated reasons which may not be inferred when the General Assembly says it must be done. More importantly, this argument ignores the plain language that until there is a motion, the contract is valid and must be enforced.

## V.

Both AT&T and Sprint occupy the right-of-way as a result of the agreements they entered into with Delaware and Hudson and Guilford, respectively, providing for allocation of costs. There is no dispute that AT&T has a mutual agreement with Delaware and Hudson that provides if AT&T is required to move its cables, it has to do so at its own expense. Sprint had an Easement Agreement with Guilford, but unlike AT&T's, its Easement Agreement provides that Guilford is to pay its costs of relocation. Although Sprint contends that its Easement Agreement survived bankruptcy, the Commission never made such a determination. Therefore, it remains unsettled whether that Easement Agreement is valid after Guilford's bankruptcy.

ence" to administrative agency decisions. One of the reasons often given for the United States Supreme Court adoption of the "strong" deference standard is because there was one administrative agency and 11 circuits, and adopting a strong deference standard would avoid circuit splits.

At the other extreme is a substantial number of other states that have adopted an "independent judgment" standard that allows a court to substitute its interpretation of the statute no matter what provision or matter is at issue. Those states have a strong bias that courts are constitutionally charged with interpreting statutes, not administrative agencies.

The approach adopted by a majority of the states is commonly known as the "sliding scale" deference. This approach is based on the realization that two types of questions of law come before the courts involving agency interpretations of law.

One type involves questions in which the particularized experience and knowledge of the administrative personnel goes into the determination. When this type of question is presented to the court for review, deference should be given to the administrative interpretation, since the expertise of the agency would be of material assistance to the court. . . .

The other kind of case presents questions of law in which knowledge and experience in the industry affords little guidance toward a proper consideration of the legal issues. These cases usually concern statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience. Consequently courts are at least as capable of deciding this kind of question as an administrative agency.

*Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971) (citing *Rogers Constr. Co. v. Hill*, 235 Or. 352, 356, 384 P.2d 219, 222 (1963)).

For the above, *See* State Judicial Review, 43 Administrative Law Review 571, Fall 1991.

■ While the Commission required AT&T to bear its own costs for relocation of its facilities as the result of the track-lowering project, which is in accord with its Easement Agreement with Delaware and Hudson, it did so only by apportioning costs pursuant to Section 2704 of the Code. However, before making a 2704 analysis, the Commission was first required to determine under Section 508 of the Code whether it would be in the public interest—i.e., whether the contract affects the public by directly influencing rates or operations of the utility—to abrogate or reform the agreement with Delaware and Hudson. If it found that it was not in the public interest, then its inquiry should have ended and it was unnecessary to determine how costs should have been allocated under Section 2704. If the Easement Agreement was in the public interest, the Commission should have made an analysis under Section 2704 of the Code utilizing the following standards:

- the party that originally built the crossing;
- the party that owned and maintained the crossing;
- the relative benefit initially conferred on each party with the construction of the crossing;
- whether either party is responsible for deterioration of the crossing that has led to the need for its repair, replacement or removal; and
- the benefit that each party will receive from the repair, replacement or removal of the crossing.

*Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 668 A.2d 615 (Pa.Cmwlth.1995). Because the Commission failed to make a finding as to whether it was in the public interest to abrogate AT&T's Easement Agreement with Delaware and Hudson, we remand the case to the Commission to make that determination.

■ The Commission would be required to utilize the same analysis as to Sprint, but only if Sprint's Easement Agreement with Guilford survived bankruptcy and was assumed by Delaware and Hudson under its asset purchase agreement from the bankrupt Guilford. Because the Commission failed to determine if the Sprint Easement Agreement survived bankruptcy, we remand this case to the Commission to make that determination and then to follow the same analysis as that used for AT&T. If the Sprint Easement Agreement survives bankruptcy and it is not in the public interest, the Commission's inquiry ends. If the Easement Agreement does not survive bankruptcy or the Commission decides to abrogate the Easement Agreement, then the Commission should consider the relevant factors under Section 2704(a) when allocating costs.

Accordingly, the decision of the Commission ordering AT&T and Sprint to pay their own relocation costs is vacated and the case remanded to the Commission to make further findings and conclusions consistent with this opinion.

### ORDER

AND NOW, this 18th day of March, 1998, the order of the Pennsylvania Public Utility Commission, dated September 25, 1996, ordering AT&T and Sprint to pay their own relocation costs is vacated and this case is remanded to the Commission to make further findings and conclusions consistent with this opinion. Jurisdiction is relinquished.